1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11    JUAN R. VAZQUEZ,

| | | |
|---|---|---|
| | ) | Case No.: 1:19-cv-00045-DAD-SAB (PC) |

12                     Plaintiff,

13          v.

14    E. CONANNAN, et.al.,

15                     Defendants.

16    _____

)
)
)
)
)
)
)
)
)
)

FINDINGS AND RECOMMENDATIONS
REGARDING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

(ECF No. 46)

17          Plaintiff Juan R. Vazquez is appearing *pro se* and *in forma pauperis* in this civil rights action

18    pursuant to 42 U.S.C. § 1983.

19          Currently before the Court is Defendants' motion for summary judgment, filed on September

20    16, 2020.

21                                          **I.**

22                              **RELEVANT BACKGROUND**

23          This action is proceeding on Plaintiff's first amended complaint against Defendants E.

24    Conanan, J. Silveira, G. Kamen, N. Siegrist, S. Hitchman and M. Vanblargen for deliberate

25    indifference in violation of the Eighth Amendment.

26          On August 23, 2019, Defendants filed an answer to the complaint.  (ECF No. 24.)

27          On August 27, 2019, the Court set a settlement conference for November 7, 2019.  (ECF No.

28    25.)

On September 26, 2019, Defendants filed a notice to opt-out of the settlement conference. (ECF No. 26.)  Therefore, on September 27, 2019, the Court vacated the settlement conference.  (ECF No. 27.)

On October 1, 2019, the Court issued the discovery and scheduling order.  (ECF No. 28.)

On January 15, 2020, Plaintiff filed his first motion to amend.  (ECF No. 31.)  Defendants filed an opposition on January 30, 2020, and Plaintiff filed a reply on February 10, 2020.  (ECF Nos. 32, 36.)  As an initial matter, the Court notes that Plaintiff's filing is a letter addressed to the Clerk of the Court which provides notice and a copy of a letter sent to defense counsel requesting permission to amend his pleadings.  (ECF No. 31.)  Plaintiff states he "just found out" that he should have submitted to the Court a copy of the letter addressed to defense counsel.  (Id.)   Given Plaintiff's pro se status, the Court construes Plaintiff's letter as a motion to amend the complaint under Federal Rule of Civil Procedure 15.

On February 5, 2020, Plaintiff filed a second motion to amend the complaint, along with a copy of the proposed amended complaint which was lodged.  (ECF Nos. 34, 35.)  Defendants filed an opposition on February 4, 2020.  (ECF No. 37.)

On April 20, 2020, the Court granted Plaintiff's motion to amend the complaint with regard to Defendant Kamen and his request for damages.  (ECF No. 39.)  Plaintiff filed a second amended complaint on May 11, 2020.  (ECF No. 40.)

On September 16, 2020, Defendants filed the instant motion for summary judgment.  (ECF No. 46.)  After receiving four extensions of time, Plaintiff filed an opposition on January 21, 2021.[1]  (ECF No. 54.)  Defendants filed a timely reply on February 11, 2021.  (ECF No. 58.)

///

///

///

---

[11] Defendants argue that Plaintiff's opposition does not fully comply with Local Rule 260(b) by not clearly stating which portion of the Defendants' statement is disputed and what portion is undisputed.  While Plaintiff may not have strictly complied with all the requirements set forth in Local Rule 260(b), the Court finds that given Plaintiff's pro se status, his opposition is sufficient for consideration.  See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

## II.

## LEGAL STANDARD

### A.      Summary Judgment Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942 (quotation marks and citation omitted).

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.

## DISCUSSION

**A.     Summary of Plaintiff's Allegations**

"Plaintiff was declared permanently disabled by orthopedic specialist Dr. Stephen Dye [and] was initially confined to a wheelchair [and] is now classified by the CDCR as a 'high risk' medical patient." (Sec. Am. Compl. at 7.)[2]

In October 2015, Plaintiff began having pain in his right heel which over the course of three months developed into a one and one-half inch open wound on both heels.

On October 20, 2015, Plaintiff submitted a request to see a specialist regarding the pain in his right heel and mobility impairments.  The next day, Defendant Dr. Kamen examined Plaintiff in an "assaultive & abusive manner, shoving Plaintiff's legs around violently, addressing Plaintiff in a loud, insulting & angry voice while discrediting Plaintiff's medical conditions & rescinding Plaintiff's wheelchair.  Defendant Kamen failed to respond reasonably; his decision to rescind Plaintiff's wheelchair clearly made Plaintiff's medical problems worse causing further & significant harm ultimately resulting in the open would previously mentioned."

On November 20, 2015, Plaintiff complained to Defendant Siegrist about the pain in his right heel and increase in mobility impairments but no care was provided.

On December 4, 2015, Plaintiff asked Siegrist to examine the open wound on his right heel. Defendant Siegrist ignored Plaintiff and did not even look at the wound.

On December 10, 2015, Plaintiff saw Siegrist again and requested treatment for the open wound on his right heel as well as for his neuropathy, arthritis, tendonitis, fatigue, and weight loss that combined made it extremely difficult for Plaintiff to perform even the simplest of daily activities.  At this point, Plaintiff's pain and discomfort was so intense he could focus on little else.  Although Plaintiff showed Siegrist his foot for the second time, he refused to examine the wound now one and one-fourth inch deep, he did not provide any treatment.

---

[2] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

On December 14, 2015, Plaintiff complained to Defendant Vanblargen of the increased pain and difficulty walking due to the open wound on his hell.  Defendant Vanblargen dressed the wound but his treatment was inadequate in that it did not prevent the wound from growing or alleviate the pain.

On December 17, 2015, Plaintiff asked Defendant Hitchman for treatment of his open wound and referral to a specialist.  After an examination, Hitchman failed to treat Plaintiff's wound or refer him to a specialist.

On December 21, 2015, Plaintiff complained again to Defendant Van Blargen of increased pain and difficulty walking because his wound had deepened and grown to over an inch in length. Van Blargen dressed the wound which did nothing to keep it from growing or to lessen the pain.

On December 23, 2015, Plaintiff complained a third time to Defendant Van Blargen of his painful wound and arthritis in his shoulder.  Van Blargen gave Plaintiff Naproxen for his arthritis but only looked at his wound without comment.

On December 28, 2015, Plaintiff complained a fourth time to Defendant Van Blargen regarding his bleeding wound.  He explained that every step he felt as if his flesh was tearing making even the most personal hygiene needs an arduous chore.  Van Blargen dressed the wound again which did nothing to keep it from growing or to lessen the pain.

On December 29, 2015, Plaintiff complained to Defendant Siegrist of his open wound and deteriorating health.  Plaintiff was nauseated, had diarrhea, suffered weight loss, was fatigued, and the open wound was bleeding.  The wound was now one and one-half inches, and Siegrist only applied the usual ineffective ointment and dressing that did nothing to heal the wound or alleviate the pain.

On January 5, 2016, Plaintiff showed Van Blargen a second wound opening on his left heel and explained the intense pain of just standing, walking to the dining room, showers, and restroom which were now arduous trips.  Plaintiff's socks were stained with blood and his neuropathy made wearing shoes torturous.  Van Blargen applied the usual ointment and dressing that proved inadequate to heal Plaintiff's wounds or address the pain.

On January 12, 2016, Plaintiff reported his growing wounds to Defendant Mathos.  Upon observing the severity of Plaintiff's wounds, Defendant Mathos ordered a three-day tegaderm dressing

5

and use of a temporary walker to alleviate the pressure of Plaintiff's weight on his heels.  However, Mathos's order was overridden by Defendants Silveira and Conanan.  Plaintiff was thereafter forced to continue walking on painful and bleeding wounds.

On January 14, 2016, Plaintiff requested treatment from Defendant Siegrist for the open wounds on his heels.  In obvious concern for the severity, Defendant Siegrist asked Defendant Silveira to assist but Silveira downplayed the seriousness of his wounds and contradicted the unified opinions of three trained professionals.  Defendant Silveira continued with the same course of treatment in applying band-aids which did nothing to heal or treat the wounds.

On January 15, 2016, Defendant Conanan responded to Plaintiff's appeal for adequate treatment of his open wounds by dismissing it as "less urgent" than other issues.  Defendant Conanan also overruled the orders by Barajas, Mathos and Vanblargen for a temporary walker causing Plaintiff further pain and harm.

On February 1, 2016, Plaintiff's emergency appeal for a wheeled mobility device was denied by Defendant Conanan as being "not medically indicated."  This denial was proven incorrect eight days later by independent specialist Orlando Zorrilla who ordered a walker for Plaintiff.

On February 5, 2016, Plaintiff complained to Defendant Vanblargen a seventh time about how much pain he was enduring.  Vanblargen noted Plaintiff's distress but continued with the same course of treatment which was so cursory it amounted to no treatment at all.

On February 9, 2016, Plaintiff was attended to by independent specialist Orlando Zorrilla who examined Plaintiff's wound and immediately noted the need for urgent treatment to prevent further injury and pain.  Dr. Zorrilla ordered Neosporin dressings, padding and a walker.

On February 10, 2016, Plaintiff was attended by Defendant Siegrist who ignored Dr. Zorrilla's orders and continued with the ineffective treatment.  Plaintiff never received further Neosporin and the padding was not provided until after his transfer on March 1, 2016.  Plaintiff was issued a walker on February 25, 2016, several days after it was prescribed, and 129 days after Plaintiff demonstrated a medical need for it.

///

///

6

**B.     Statement of Undisputed Facts[3],[4]**

1.      At all times relevant to this action, Plaintiff was in the custody of the California Department of Corrections and Rehabilitation (CDCR) as a prisoner at Avenal State Prison (ASP). (Pl.'s Dep. at 9:12-14, Attach 1, ECF No. 46-3.)

2.      At all relevant times, Dr. Conanan was employed by CDCR as a physician at ASP. (Declaration of Dr. Conanan ("Conanan Decl.") ¶ 1, Attach 2, ECF No. 46-3.)

3.      At all relevant times, Dr. Kamen was employed by CDCR as a physician at ASP. (Declaration of Dr. Kamen ("Kamen Decl.") ¶ 1, Attach 3, ECF No. 46-3.)

4.      At all relevant times, Siegrist was employed by CDCR as a physician assistant at ASP. (Declaration of Siegrist ("Siegrist Decl.") ¶, Attach 4, ECF No. 46-3.)

5.      At all relevant times, Hitchman was employed by CDCR as a physician assistant at ASP. (Declaration of Hitchman ("Hitchman Decl.") ¶, Attach 5, ECF No. 46-3.)

6.      At all relevant times, Silveira was employed by CDCR as a registered nurse at ASP.[5] (Declaration of Silveira ("Silveira Decl.") ¶, Attach 6, ECF No. 46-3.)

7.      At all relevant times, Van Blargen was employed by CDCR as a registered nurse at ASP. (Declaration of Van Blargen ("Van Blargen Decl.") ¶, Attach 7, ECF No. 46-3.)

8.      In evaluating an inmate-patient's medical or mobility conditions, a medical provider bases his or her evaluation on the inmate-patient's physical condition, the inmate-patient's statements, and available medical records at the time of the visit.  (Conanan Decl. ¶ 13; Kamen Decl. ¶ 9.)

9.      Finding that a patient has demonstrated a need for a mobility device does not necessarily undermine prior findings that no mobility device was medically indicated, because the inmate-patient's ambulation abilities may change over time.  (Conanan Decl. ¶ 13; Kamen Decl. ¶ 9.)

---

[3] Hereinafter referred to as "UdF."

[4] Plaintiff disputes almost every statement of undisputed fact presented by Defendants.  However, a majority of Plaintiff's objections do not actually dispute the facts as set forth by Defendants and merely adds additional facts relating to his legal argument.  Accordingly, the Court will not address all of Plaintiff's objections, and will only address those that have actual merit.

[5] Silveira retired from CDCR in June 2017 and has not been employed as a registered nurse since retiring.  (Silveira Decl. ¶ 1.)

10.     To the extent that an inmate-patient presents differently to different providers, whether intentional or not, this could contribute to different medical assessments and conclusions by the examining medical provider.  (Conanan Decl. 13; Kamen Decl. ¶ 9.)

11.     A medical provider may take into account objective indicators that an inmate-patient can ambulate satisfactorily despite different presentations that the inmate-patient makes to the examining medical provider.  (Conanan Decl. 13; Kamen Decl. ¶ 9.)

12.     Although medical provider—including, but not limited to, physicians and physician assistants—attempt to address all medical issues during regularly scheduled appointments, when more urgent medical issues are presented, these more urgent issues may take precedence over routine or less urgent concerns, such that medical issues are prioritized and addressed accordingly through a standard process referred to as triage.  (Conanan Decl. ¶ 4.)

Plaintiff's Visit with Dr. Kamen on October 21, 2015

13.     On October 21, 2015, Dr. Kamen saw Plaintiff for a medical visit.  (Kamen Decl. ¶ 4.)

14.     The purpose of the October 21, 2015 visit between Dr. Kamen and Plaintiff was for Dr. Kamen to evaluate Plaintiff's disability status, need for a wheelchair, and need for any other accommodations in light of Plaintiff's claim that he felt pain his feet and heels.  (Kamen Decl. ¶ 5.)

15.     During the October 21, 2015 visit, Dr. Kamen conducted a physical examination of Plaintiff, including his bodily extremities and motion.  (Kamen Decl. ¶ 5; Pl.'s Dep. at 20:11-20.)

16.     Based on the October 21, 2015 physical examination, Dr. Kamen observed that there was no callus formation on Plaintiff's feet, did not observe any significant deformity, and concluded that Plaintiff's gait was steady.  (Kamen Decl. ¶ 5.)

17.     During the October 12, 2015 visit, Dr. Kamen learned and believed that Plaintiff had been jumping rope earlier that month.  (Kamen Decl. ¶ 5.)

18.     Based on the October 12, 2015 physical examination, evaluation of Plaintiff's physical condition and mobility, evaluation of Plaintiff's medical records, evaluation of Plaintiff's complaints, and confirmation that Plaintiff had been jumping rope earlier in the month, Dr. Kamen concluded that Plaintiff was able to ambulate satisfactorily and, therefore, did not need a wheelchair.  On this basis, Dr. Kamen rescinded Plaintiff's wheelchair accommodation.  (Kamen Decl. ¶ 6, Pl.'s Dep. at 24:1-6.)

8

19.     In evaluating complaints that Plaintiff presented during his October 21, 2015 visit, Dr. Kamen considered Plaintiff's claims in light of objective findings and results from the physical examination.  (Kamen Decl. ¶¶ 5-6, 9.)

20.     Dr. Kamen's medical opinion was informed, in part, from his assessment that Plaintiff's conduct such as jumping rope was incompatible with suffering from a physical disability, informing Dr. Kamen's opinion that Plaintiff appeared to be engaging in manipulative behavior. (Kamen Decl. ¶¶ 6-7; Pl.'s Dep. at 22:10-12.)

Plaintiff's Visits with Physician Assistant Siegrist

21.     On November 20, 2015, in her capacity as a physician assistant, Siegrist saw Plaintiff for a medical visit.  (Siegrist Decl. ¶ 4; Pl.'s Dep. at 28:2-6.)

22.     The purpose of the November 20, 2015 visit between Siegrist and Plaintiff was to follow up on the status of a computed tomography scan (also referred as "CT scan" or "CAT scan") performed on December 1, 2015, as well as to evaluate Plaintiff's lung disease.  (Siegrist Decl. ¶ 4.)

23.     The main issue discussed during the November 20, 2015 visit was Plaintiff's reactions to medications intended to treat his lung disease symptoms, but Siegrist also addressed Plaintiff's request that his walker be returned to him.  (Siegrist Decl. ¶ 4; Pl.'s Dep. at 29:21-23, 30:8-10, 24.)

24.     In evaluating whether to grant Plaintiff's walker request, Siegrist learned and believed that Plaintiff had been observed jumping rope, which, in her view, contributed to the decision to previously rescind Plaintiff's walker.  (Siegrist Decl. ¶ 4.)

25.     During the November 20, 2015 visit, based on Plaintiff's documented history of jumping rope, Siegrist denied Plaintiff's request for a walker.  (Siegrist Decl. ¶ 4.)

26.     During the November 20, 2015 visit, Siegrist advised Plaintiff on his upcoming appointment with an orthotics specialist, who would further address Plaintiff's mobility-related complaints, to which Plaintiff confirmed that he understood.  (Siegrist Decl. ¶ 4.)

27.     Beyond the care and education provided to Plaintiff, Siegrist did not believe further action was necessary during the November 20, 2015 visit.  (Siegrist Decl. ¶ 4.)

///

///

9

28.     On December 4, 2015, Siegrist met with Plaintiff to interview him in connection with the review of a healthcare grievance that Plaintiff filed, identified as grievance log number ASP HC 15029556, in which Plaintiff requested that his seated walker be reinstated.  (Siegrist Decl. ¶ 5.)

29.     During the December 4, 2015 interview, Siegrist learned or was aware that Dr. Kamen had previously evaluated Plaintiff's mobility issues on October 21, 2015 and performed a physical examination that revealed no difficulty ambulating, and that medical staff had observed Plaintiff jumping rope for approximately one minutes with no signs of difficulty.  (Siegrist Decl. ¶ 5.)

30.     On December 4, 2015, when Plaintiff was unaware that Siegrist was observing him, Siegrist observed Plaintiff walking to a medical clinic without exhibiting any ambulation issues. (Siegrist Decl. ¶ 5.)

31.     Based on Plaintiff's medical history, Plaintiff's explanations during the December 4, 2015 interview, and Siegrist's personal observations of Plaintiff ambulating without distress or balance issues, Siegrist concluded that Plaintiff could ambulate satisfactorily and, therefore, deemed that no further action was necessary.  (Siegrist Decl. ¶ 5; Pl.'s Dep. at 33:16-19.)

32.     On December 10, 2015, Siegrist saw Plaintiff for a medical visit.  (Siegrist Decl. ¶ 6; Pl.'s Dep. at 35:1-3.)

33.     The purpose of the December 10, 2015 visit between Siegrist and Plaintiff was to follow up on a CAT scan performed on December 1, 2015.  (Siegrist Decl. ¶ 6.)

34.     During the December 10, 2015 visit, Siegrist discussed the CAT scan findings, which confirmed the existence of chronic interstitial lung disease and pulmonary fibrosis.  (Siegrist Decl. ¶ 6.)

35.     During the December 10, 2015 visit, Siegrist attempted to convey to Plaintiff the seriousness of his lung condition and weight loss, but Plaintiff wanted to re-focus the conversation back to his complaints about pain in his feet.  (Siegrist Decl. ¶ 6.)

36.     During the December 10, 2015 visit, Siegrist advised Plaintiff that his focus should be his lung function and weight loss, and further advised him that he was being referred for additional pulmonary tests and would undergo a pulmonology consultation.  (Siegrist Decl. ¶ 6.)

37.     Upset at Siegrist's attempt to re-focus attention to his lung condition, Plaintiff left the exam room before Siegrist could conclude the December 10, 2015 visit, albeit Siegrist nonetheless scheduled Plaintiff for a follow-up referral.  (Siegrist Decl. ¶ 6.)

38.     During the December 10, 2015 visit, Siegrist concluded that Plaintiff's health would be best served by focusing on addressing his lung condition and weight loss.  (Siegrist Decl. ¶ 6.)

39.     On February 24, 2016, Siegrist saw Plaintiff for a medical visit.  (Siegrist Decl. ¶ 7.)

40.     During the February 24, 2016 visit, Siegrist reviewed the medical consultation noted, dated February 9, 2016, by Dr. Zorrilla who noted that Plaintiff's nails, fissures, and lesions were "debrided," and were cleaned and dressed with a multilayer compression, and Plaintiff was instructed to keep the compressing dressing intact for a minimum of two days.  (Siegrist Decl. ¶ 7.)

41.     During the February 24, 2016 visit, Siegrist further noted the findings from Plaintiff's lung biopsy taken on January 13, 2016, whereby Siegrist concluded that Plaintiff had chronic interstitial disease and further discussed with Plaintiff the pain he felt around his left elbow and steroid injection to address the pain.  (Siegrist Decl. ¶ 8.)

42.     In light of Plaintiff's health condition during the February 24, 2016 visit, as well as the findings and recommendation made by Dr. Zorrilla during the February 9, 2016 consultation, Siegrist determined that granting a temporary walker for sixty days was warranted, and further submitted requests for follow-up podiatry and pulmonology consultations.  (Siegrist Decl. ¶ 8.)

Plaintiff's Visits with Registered Nurse Van Blargen

43.     On December 14, 2015, in his capacity as a registered nurse, Van Blargen saw Plaintiff for a medical visit, which was prompted by a health care request form submitted by Plaintiff in which he complained about lesions on his foot that frustrated his ability to walk.  (Van Blargen Decl. ¶ 5.)

44.     During the December 14, 2015 visit, Van Blargen observed a cut (also known as a fissure) to Plaintiff's right heel, which was approximately two centimeters long.  (Van Blargen Decl. ¶ 6.)

45.     In evaluating the cut to Plaintiff's right heel during the December 14, 2015 visit, Van Blargen observed dry cracking on both feet, noticed foot fungus formation, but otherwise observed no active bleeding.  (Van Blargen Decl. ¶ 6.)

46.     Based on observations of Plaintiff's right heel on December 14, 2015, Van Blargen's medical opinion was that the cut appeared to be a chronic and, therefore, long-term condition.  (Van Blargen Decl. ¶ 6.)

47.     Acknowledging that the cut could cause pain, Van Blargen's medical opinion, based on his observation of Plaintiff's foot during the December 14, 2015 visit, was that the cut did not pose a substantial risk to Plaintiff's health.  (Van Blargen Decl. ¶ 6.)

48.     Based on his observation of Plaintiff's foot during the December 14, 2015 visit, Van Blargen determined that, under the circumstances, wound care via sterilization and dressing was reasonable and sufficient to mitigate further injury and infection risk, assuming Plaintiff followed the advice of medical staff.  (Van Blargen Decl. ¶ 6.)

49.     On December 21, 2015, Van Blargen saw Plaintiff for a medical visit, which was prompted by a health care request form submitted by Plaintiff in which he complained about a cut to his right heel area and request for a walker.  (Van Blargen Decl. ¶ 7; Pl.'s Dep. at 43:12-25.)

50.     During the December 21, 2015 visit Van Blargen observed that the cut was two-to-three centimeters, remained without signs and symptoms of an infection, and appeared to be improving.  (Van Blargen Decl. ¶ 7.)

51.     During the December 21, 2015 visit, Van Blargen instructed Plaintiff to continue with daily dressing, and informed Plaintiff that he would discuss his request for a walker with his primary care physician, noting that a follow-up visit had been scheduled for the following week.  (Van Blargen Decl. ¶ 7.)

52.     On December 23, 2015, Van Blargen saw Plaintiff for a medical visit, which was prompted by a health care request form in which Plaintiff mainly complained about pain in both shoulders, albeit he also complained about pain his right heel.  (Van Blargen Decl. ¶ 8.)

53.     During the December 23, 2015 visit, Van Blargen measured Plaintiff's vital signs—such as his blood pressure, pulse rate, and temperature—and also observed his range of movement and bodily extremities.  (Van Blargen Decl. ¶ 8.)

54.     While the December 23, 2015 visit mostly focused on Plaintiff's shoulder pain, Van Blargen note that Plaintiff was referred to a podiatry specialist to assess his foot-related pain.  (Van Blargen Decl. ¶ 8.)

55.     On December 28, 2015, Van Blargen saw Plaintiff for a medical visit, which was prompted by Plaintiff's complaints pertaining to his foot fungus and sharp pain arising from the cut to his right heel area.  (Van Blargen Decl. ¶ 9.)

56.     During the December 28, 2015 visit, Van Blargen observed substantial callus formation on his right foot (i.e., thickening and hardening of the skin due to exposure to repeated friction), as well as foot fungus and a cut to his right heel.  (Van Blargen Decl. ¶ 9.)

57.     Based on observations of Plaintiff's physical condition and medical assessment during the December 28, 2015 visit, Van Blargen's medical opinion was that proper foot care and hygiene were key to effectively managing Plaintiff's cut to his heel, and, on this basis, Van Blargen cleaned, applied antibiotic ointment to, and re-dressed Plaintiff's right foot.  (Van Blargen Decl. ¶ 9.)

58.     During the December 28, 2015 visit, Van Blargen advised Plaintiff to make sure to keep his feet clean, using soap and water, and to ensure his feet remained dry.  (Van Blargen Decl. ¶ 9.)

59.     On January 5, 2016, Van Blargen saw Plaintiff for a medical visit, which was prompted by Plaintiff's complaint pertaining to a cut to his left heel care.  (Van Blargen Decl. ¶ 10; Pl.'s Dep. at 51:19-20.)

60.     During the January 5, 2016 visit, Van Blargen observed that the cut was located within the middle left heal area—amid callous, dry, and cracking skin.  (Van Blargen Decl. ¶ 10.)

61.     The cut to Plaintiff's left heel developed approximately one week before the January 5, 2016 visit.  (Van Blargen Decl. ¶ 10.)

62.     During the January 5, 2016 visit, Van Blargen observed that the cut to Plaintiff's left heel was approximately 1.5 centimeters in length.  (Van Blargen Decl. ¶ 10.)

63.     During the January 5, 2016 visit, Van Blargen observed that the cut to Plaintiff's right heel remained largely unchanged, albeit the right heel area became heavily callused but was without any active bleeding.  (Van Blargen Decl. ¶ 10.)

13

64.     During the January 5, 2016 visit, Van Blargen irrigated and cleansed the cuts to both feet using sodium Chloride Irrigation solution and Chlorhexidine skin cleanser, both of which were standard sterilizing solutions.  (Van Blargen Decl. ¶ 10.)

65.     During the January 5, 2016 visit, Van Blargen learned that Plaintiff had a pending appointment with a podiatry specialist, who would address the cuts to his feet as well as the callus issues, and otherwise referred him for a follow-up appointment with the registered nursing clinic. (Van Blargen Decl. ¶ 10.)

66.     On February 5, 2016, Van Blargen saw Plaintiff for a medical visit, the purpose of which was to follow up on the cuts to Plaintiff's heels.  (Van Blargen Decl. ¶ 11.)

67.     During the February 5, 2016 visit, Plaintiff reported no change in either foot, albeit Plaintiff reported that he still experienced pain and continued to have difficulty walking.  (Van Blargen Decl. ¶ 11.)

68.     During the February 5, 2016 visit, Van Blargen observed that Plaintiff was ambulating with a cane, and further observed that there was no sign of infection on Plaintiff's feet.  (Van Blargen Decl. ¶ 11.)

69.     During the February 5, 2016 visit, Van Blargen noted that a podiatry consultation had been scheduled for February 9, 2016.  (Van Blargen Decl. ¶ 11.)

70.     During the February 5, 2016 visit, Van Blargen provided instruction to Plaintiff to maintain all his follow up appointments and to take all prescribed medications in accordance with his primary care physician's order, to which Plaintiff responded that he understood.  (Van Bargen Decl. ¶ 11.)

71.     While Van Bargen noted the pain reported by Plaintiff during the February 5, 2016 visit, Van Blargen's medical opinion nonetheless was that no further action was medically necessary, pending the consultation with the podiatric specialist.  (Van Blargen Decl. ¶ 11.)

72.     As a registered nurse, Van Blargen did not have authority to, and accordingly did not, prescribe medications, issue medical orders, approve or deny any request for a mobility device, or override the orders or treatment plans of other medical providers such as a podiatry specialist, physician assistant, or physician.  (Van Blargen Decl. ¶ 13.)

73.     During the relevant times, Plaintiff did not comply with medical staff's advice and/or instructions with respect to proper foot care—including, but not limited to, walking on prison grounds without any socks or shoes—which can exacerbate cuts to the heels.  (Van Blargen Decl. ¶ 14.)

Plaintiff's Visit with Physician Assistant Hitchman on December 17, 2015

75.     On December 17, 2015, in his capacity as a physician assistant, Hitchman saw Plaintiff for a medical visit, which was prompted by Plaintiff's complaint pertaining to reported difficulties ambulating due to lower body pain.  (Hitchman Decl. ¶ 4.)

76.     During the December 17, 2015 visit, Hitchman conducted a physical examination of Plaintiff, examining his chest and back area, which revealed no bruising or abrasions. (Hitchman Decl. ¶ 4.)

77.     During the December 17, 2015 visit, Plaintiff presented as having an unsteady gait and balance.  (Hitchman Decl. ¶ 4.)

78.     From the physical examination on December 17, 2015, Hitchman observed that Plaintiff's gait appeared extremely deliberate and erratic, and objective findings from a strength examination revealed that Plaintiff could ambulate satisfactorily.  (Hitchman Decl. ¶ 4.)

79.     Based on his observations, findings, and assessments during the December 17, 2015 visit, Hitchman had significant reservations about the way Plaintiff attempted to present himself during the visit, and concluded that inconsistencies between Plaintiff's attempted presentation and the objective findings from the physical examination reflected manipulative behavior on Plaintiff's part. (Hitchman Decl. ¶ 5.)

80.     Based on his observations, findings, and medication assessments during the December 17, 2015 visit, Hitchman concluded that Plaintiff had minimal-to-no mobility impairment and, therefore, rescinded the wheelchair accommodation.  (Hitchman Decl. ¶ 5.)

81.     During the December 17, 2015 visit, Hitchman advised Plaintiff to wear his orthotic shoes, and referred Plaintiff to his primary care physician for further determination.  (Hitchman Decl. ¶ 5.)

///

///

15

Plaintiff's Visits with Registered Nurse Silveira

82.   With respect to any medical care that Silveira provided to Plaintiff, as a registered nurse, Silveira did not have authority to, and did not, issue any medical orders, approve, or deny any request for a mobility device, or override the orders or treatment plans of other medical providers such as a podiatry specialist, physician assistant, or physician.  (Silveira Decl. ¶ 6.)

83.   As a registered nurse, Silveira did not have authority to issue any binding orders or commands to physician assistants, including physician assistant Siegrist.  (Silveira Decl. ¶ 6.)

84.   During the January 14, 2015 visit, Silveira only observed Plaintiff's foot condition. (Pl.'s Dep. at 56:1-7.)

85.   Any opinion that Silveira communicated to medical staff, including physician assistant Siegrist, pertaining to Plaintiff's foot condition was informal, complimentary, and non-binding. (Silveira Decl. ¶ 6.)

86.   Based on observations of Plaintiff's foot condition, and in light of Plaintiff's medical complaints and/or presentation, Silveira did not believe that Plaintiff had a foot condition that posed a substantial risk of serious harm.  (Silveira Decl. ¶¶ 4, 7.)

87.   Any action taken or opinion expressed by Siegrist in connection with Plaintiff's foot condition did not bind or control the medical opinions or treatments of other medical providers. (Silveira Decl. ¶¶ 5-6.)

Plaintiff's Visits with Dr. Conanan

88.   On January 12, 2016, Dr. Conanan met with Plaintiff to interview him in connection with the review of a healthcare grievance, identified as grievance log number ASP HC 15029625, which grieved that Plaintiff was provided with inadequate health care, in particular that Siegrist was indifferent to and ignored issues pertaining to his shoulder pain, tendonitis, and "lesions" on his foot. (Conanan Decl. ¶ 5.)

89.   During the January 12, 2016 interview, Plaintiff was allowed to fully explain his grievance issues.  (Conanan Decl. ¶ 5.)

///

///

90.     Based on Dr. Conanan's review of Plaintiff's grievance and pertinent medical records, Dr. Conanan concluded that Plaintiff's staff misconduct allegation was not substantiated.  (Conanan Decl. ¶ 6.)

91.     Dr. Conanan's conclusion from the January 12, 2016 interview was based on his assessment that, during his visit with physician assistant Siegrist, Plaintiff's lung condition and related symptoms took priority over less urgent conditions such as the cut to his foot, justifying Siegrist's focus on Plaintiff's lung issues.  (Conanan Decl. ¶ 6.)

92.     Dr. Conanan further concluded that, contrary to what Plaintiff claimed, his foot-related complaint was not ignored, but rather Plaintiff's foot-related grievance was appropriately noted, and the cut to his heel was appropriately treated with ointment and dressing.  (Conanan Decl. ¶ 6.)

93.     From the January 12, 2016 interview, Dr. Conanan further concluded that, given Plaintiff's musculoskeletal condition—i.e., condition pertaining to his muscle and skeletal systems— was stable and adequately addressed under the circumstances, no further intervention was medically necessary.  (Conanan Decl. ¶ 6.)

94.     On February 1, 2016, a first-level institutional response was issued concerning a healthcare grievance filed by Plaintiff, identified as grievance log number ASP HC 15029632, which grieved that physician assistant Hitchman examined Plaintiff to determine whether he needed a wheelchair given his "lesion" on his right heel but improperly focused on other issues and rescinded the wheelchair.  (Conanan Decl. ¶ 7.)[6]

95.     Dr. Conanan reviewed Plaintiff's grievance log number ASP HC 15029632 and pertinent medical records, and found that nurse practitioner Mathos evaluated him and noted foot calluses but did not order a walker; Plaintiff's foot received wound care dressing; and Plaintiff was referred to a podiatry specialist and awaiting consultation.  (Conanan Decl. ¶ 8.)

///

///

---

[6] Dr. Conanan's declaration contains a typographical error as it incorrectly references the grievance as log number ASP HC 15029625, not log number ASP HC 15029632.

96.     Based on his review of the medical records and findings, Dr. Conanan concurred with the determination that neither a wheelchair not walker was medically indicated, and grievance log number ASP HC 15029632 was partially granted.  (Conanan Decl. ¶ 8.)

<u>Plaintiff's Visit with Dr. Zorrilla on February 9, 2016</u>

97.     On February 9, 2016, in his capacity as a Doctor of Podiatric Medicine, Dr. Zorrilla saw Plaintiff for a podiatry consultation to assess and treat Plaintiff's feet pains and conditions.  (Conanan Decl. ¶ 10; Siegrist Decl. ¶ 7.)

98.     During the February 9, 2016 visit, Dr. Zorrilla noted Plaintiff's fissures and reported pain in his feet, as well as reported ambulation difficulties.  (Conanan Decl. ¶ 10; Siegrist Decl. ¶ 7.)

99.     During the February 9, 2016 visit, Plaintiff's nails, fissures, and lesions were debrided, which is the medical process of removing damaged skin to achieve healing or other health benefits.  (Conanan Decl. ¶ 10; Siegrist Decl. ¶ 7.)

100.    The debrided area was cleaned and dressed with a multilayer compression during the February 9, 2016 visit, and Plaintiff was instructed to keep the compressing dressing intact for a minimum of two days.  (Conanan Decl. ¶ 10; Siegrist Decl. ¶ 6.)

101.    During the February 9, 2016 visit, Dr. Zorrilla recommended that a walker be issued to assist Plaintiff gain balance and alleviate pressure, and further recommended that his ankle-foot orthosis (AFO) be padded.  (Conanan Decl. ¶ 10; Siegrist Decl. ¶ 7.)

**C.    Analysis of Defendants' Motion**

Defendants argue that the undisputed evidence demonstrates Defendants provided proper treatment to Plaintiff under the circumstances.

Plaintiff argues that the undisputed evidence establishes more than a different of opinion because Defendants acted with deliberate indifference in causing the opening of two wounds on his heels which grew to 1.5 inches, with a depth of .25 inches, causing extreme pain with every step that often immobilized him.  Plaintiff contends despite knowledge of the extent of his pain, Defendants ignored his numerous appeals offering only minimal treatment which constituted no treatment at all.

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to

18

an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

"A difference of opinion between a physician and the prisoner - or between medical professionals - concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)).  Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to her health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).  In addition, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, 429 U.S. 97, 106 (1977); Snow v. McDaniel, 681 F.3d 987-88, overruled in part on other grounds, Peralta v. Dillard, 744 F.3d at 1082-83; Wilhelm, 680 F.3d at 1122.

    1.    Defendant Dr. Kamen

Plaintiff alleges that on October 21, 2015, Defendant Dr. Kamen examined Plaintiff in an "assaultive & abusive manner, shoving Plaintiff's legs around violently, addressing Plaintiff in a loud, insulting & angry voice while discrediting Plaintiff's medical conditions & rescinding Plaintiff's wheelchair.  Defendant Kamen failed to respond reasonably; his decision to rescind Plaintiff's

wheelchair clearly made Plaintiff's medical problems worse causing further & significant harm ultimately resulting in the open would previously mentioned." (Sec. Am. Compl. at 8.)

It is undisputed that on October 21, 2015, Dr. Kamen saw Plaintiff for a medical visit. (UDF 13.) The purpose of the October 21, 2015 visit between Dr. Kamen and Plaintiff was for Dr. Kamen to evaluate Plaintiff's disability status, need for a wheelchair, and need for any other accommodations in light of Plaintiff's claim that he felt pain his feet and heels. (UdF 14.) During the October 21, 2015 visit, Dr. Kamen conducted a physical examination of Plaintiff, including his bodily extremities and motion. (UdF 15.) Based on the October 21, 2015 physical examination, Dr. Kamen observed that there was no callus formation on Plaintiff's feet, did not observe any significant deformity, and concluded that Plaintiff's gait was steady. (UdF 16.) During the October 12, 2015 visit, Dr. Kamen learned and believed that Plaintiff had been jumping rope earlier that month. (UdF 17.) Based on the October 12, 2015 physical examination, evaluation of Plaintiff's physical condition and mobility, evaluation of Plaintiff's medical records, evaluation of Plaintiff's complaints, and confirmation that Plaintiff had been jumping rope earlier in the month, Dr. Kamen concluded that Plaintiff was able to ambulate satisfactorily and, therefore, did not need a wheelchair. On this basis, Dr. Kamen rescinded Plaintiff's wheelchair accommodation. (UdF 18.) In evaluating complaints that Plaintiff presented during his October 21, 2015 visit, Dr. Kamen considered Plaintiff's claims in light of objective findings and results from the physical examination. (UdF 19.) Dr. Kamen's medical opinion was informed, in part, from his assessment that Plaintiff's conduct such as jumping rope was incompatible with suffering from a physical disability, informing Dr. Kamen's opinion that Plaintiff appeared to be engaging in manipulative behavior. (UdF 20.)

In opposition, Plaintiff contends that appeal log number ASP SC 15000662 impeaches Dr. Kamen's and creates a dispute of fact as to his medical care because reviewing staff determined that Dr. Kamen violated CDCR policies. (ECF No. 54, Opp'n at 8-10, 12, 100-01.) However, the determination that Dr. Kamen failed to comply with CDCR policies, specifically Title 15 of the California Code of Regulations section 3391 (dealing with professionalism and courteous behavior) is irrelevant to the issue of whether he was deliberately indifference under the Eighth Amendment. See Valdez v. Farmon, 766 F. Supp. 1529, 1537 (E.D. Cal. 1991) ("This court knows of no authority that

holds that an Eighth Amendment constitutional interest is created by state regulations, the violation of which gives rise to a constitutional tort."), rev'd on other grounds, 1993 U.S. App. LEXIS 4976 (9th Cir. Mar. 10, 1993).  "[V]iolation of state tort law, state regulations, rules and policies of the CDCR, or other state law is not sufficient to state a claim for relief under [Section] 1983." Ruiz v. Orozco, No. 1:19-cv-00048-AWI-GSA-PC, 2020 WL 3058332, at *8 (E.D. Cal. June 9, 2020); accord Hammler v. Alvarez, No. 3:18-cv-0326-AJB-WVG, 2019 WL 3315567, at *4 (S.D. Cal. July 23, 2019) ("[A] prison official's violation of a prison regulation does not itself establish a constitutional violation."). Therefore, the fact that Dr. Kamen violated a prison regulation does not demonstrate that he acted with deliberate indifference to Plaintiff's serious medical needs.

Plaintiff further declares that there were three documented falls in his medical records, and at least one in the correctional officer's daily log for ASP Building E520.  (ECF No. 54, Opp'n at 64.) However, Plaintiff contends this is not the complete account of the numerous times that he fell or simply tripped while engaging in his daily activities.  Plaintiff claims that he feared retribution by Defendant Dr. Kamen who threatened him not to "play the fall game."  (Id.)  Plaintiff contends that Dr. Kamen actually rescinded all of his accommodations which caused Plaintiff to fear further retribution.  (Id.)  Even assuming the validity of Plaintiff's allegations, Plaintiff fails to demonstrate that Dr. Kamen acted with deliberate indifference to a serious medical need.  See, e.g., McClellan v. Bassett, 2006 WL 2079371 (D. Va. 2006) ( "an institutional employee's verbal harassment or idle threats to an inmate, even if they cause an inmate fear, anxiety, or discomfort, do not constitute an invasion of any identified liberty interest.").  Furthermore the undisputed facts establish that Dr. Kamen concluded that Plaintiff was able to ambulate well enough without the medical necessity for a wheelchair.  Plaintiff has identified no evidence suggesting that Dr. Kamen's stated reasons for this decision were not his actual subjective reasons.  Rather, Plaintiff argues that because of his alleged falls Dr. Kamen was should not have rescinded his wheelchair accommodation.  The Court disagrees. The fact that plaintiff had previously been issued a wheelchair accommodation does not establish deliberate indifference  by Dr. Kamen.  Further, Plaintiff's report that he had previously fallen three (or more) times does not demonstrate that Dr. Kamen was deliberately indifferent by rescinding his wheelchair accommodation, as Plaintiff cannot provide medical opinion as to the necessity of the

accommodation.  Fed. R. Evid. 702; <u>see also</u> <u>Snow v. McDaniel</u>, 681 F.3d at 987; <u>Hutchinson v.</u>

<u>United States</u>, 838 F.2d 390, 392 (9th Cir. 1988) (appropriate standard of care for medical treatment

can only be established by expert medical testimony; inmate plaintiff's allegations supported only by

lay opinions failed to present a triable issue of fact).   Moreover, even if there was a difference of

opinion among doctors about the appropriate accommodations for Plaintiff, such difference of medical

opinion is insufficient as a matter of law to establish deliberate indifference. <u>Toguchi v. Chung</u>, 391

F.3d 1051, 1058 (9th Cir. 2004); <u>Jackson v. McIntosh</u>, 90 F.3d at 332.  Where there is a difference of

opinion, Plaintiff can prevail only if the course of treatment defendant chose was medically

unacceptable under the circumstances, and was chosen in conscious disregard of an excessive risk to

plaintiff's health or safety. <u>Jackson</u>, 90 F.3d at 332. The record in this case is devoid of evidence that

Dr. Kamen's choice to rescind the wheelchair accommodation was "medically unacceptable."

Plaintiff has failed to rebut the medical opinion offered by Defendant Dr. Kamen with any competent

evidence asserting that the course of treatment provided was inappropriate for his medical condition.

<u>See</u> <u>Jackson</u>, 90 F.3d at 332.

> 2.    <u>Defendant Physician Assistant Siegrist</u>

Plaintiff contends that on November 20, 2015, he complained to Defendant Siegrist about pain

in his right foot but no care was provided.  (Sec. Am. Compl. at 8.)  On December 4, 2015, Plaintiff

contends he urged Siegrist to examine his wound, but he again ignored it.  (<u>Id.</u>)  On December 10,

2015, Plaintiff saw Siegrist and requested treatment for his open wound, as well as other related

ailments that made it extremely difficult for him to perform daily chores.  (<u>Id.</u>)  Plaintiff attempted to

show Siegrist his wound during this visit, but Siegrist ignored it.  (<u>Id.</u>)

It is undisputed that on November 20, 2015, in her capacity as a physician assistant, Siegrist

saw Plaintiff for a medical visit.  (UdF 21.)   The purpose of the November 20, 2015 visit between

Siegrist and Plaintiff was to follow up on the status of a computed tomography scan (also referred as

"CT scan" or "CAT scan") performed on December 1, 2015, as well as to evaluate Plaintiff's lung

disease.  (UdF 22.)  The main issue discussed during the November 20, 2015 visit was Plaintiff's

reactions to medications intended to treat his lung disease symptoms, but Siegrist also addressed

Plaintiff's request that his walker be returned to him.  (UdF 23.)  In evaluating whether to grant

22

Plaintiff's walker request, Siegrist learned and believed that Plaintiff had been observed jumping rope, which, in her view, contributed to the decision to previously rescind Plaintiff's walker.  (UdF 24.)  During the November 20, 2015 visit, based on Plaintiff's documented history of jumping rope, Siegrist denied Plaintiff's request for a walker.  (UdF 25.)   Siegrist advised Plaintiff on his upcoming appointment with an orthotics specialist, who would further address Plaintiff's mobility-related complaints, to which Plaintiff confirmed that he understood.  (UdF 26.)  Beyond the care and education provided to Plaintiff, Siegrist did not believe further action was necessary during the November 20, 2015 visit.  (UdF 27.)

On December 4, 2015, Siegrist met with Plaintiff to interview him in connection with the review of a healthcare grievance that Plaintiff filed, identified as grievance log number ASP HC 15029556, in which Plaintiff requested that his seated walker be reinstated.  (UdF 28.)  During the December 4, 2015 interview, Siegrist learned or was aware that Dr. Kamen had previously evaluated Plaintiff's mobility issues on October 21, 2015 and performed a physical examination that revealed no difficulty ambulating, and that medical staff had observed Plaintiff jumping rope for approximately one minutes with no signs of difficulty.  (UdF 29.)  On December 4, 2015, when Plaintiff was unaware that Siegrist was observing him, Siegrist observed Plaintiff walking to a medical clinic without exhibiting any ambulation issues.  (UdF 30.)  Based on Plaintiff's medical history, Plaintiff's explanations during the December 4, 2015 interview, and Siegrist's personal observations of Plaintiff ambulating without distress or balance issues, Siegrist concluded that Plaintiff could ambulate satisfactorily and, therefore, deemed that no further action was necessary.  (UdF 31.)

On December 10, 2015, Siegrist saw Plaintiff for a medical visit.  (UdF 32.)  The purpose of the December 10, 2015 visit between Siegrist and Plaintiff was to follow up on a CAT scan performed on December 1, 2015.  (UdF 33.)  During the December 10, 2015 visit, Siegrist discussed the CAT scan findings, which confirmed the existence of chronic interstitial lung disease and pulmonary fibrosis.  (UdF 34.)  Siegrist attempted to convey to Plaintiff the seriousness of his lung condition and weight loss, but Plaintiff wanted to re-focus the conversation back to his complaints about pain in his feet.  (UdF 35.)  Siegrist advised Plaintiff that his focus should be his lung function and weight loss, and further advised him that he was being referred for additional pulmonary tests and would undergo a

23

pulmonology consultation.  (UdF 36.)  Upset at Siegrist's attempt to re-focus attention to his lung condition, Plaintiff left the exam room before Siegrist could conclude the December 10, 2015 visit, albeit Siegrist nonetheless scheduled Plaintiff for a follow-up referral.  (UdF 37.)  Siegrist concluded that Plaintiff's health would be best served by focusing on addressing his lung condition and weight loss.  (UdF 38.)

On February 24, 2016, Siegrist saw Plaintiff for a medical visit.  (UdF 39.)  During the February 24, 2016 visit, Siegrist reviewed the medical consultation noted, dated February 9, 2016, by Dr. Zorrilla who noted that Plaintiff's nails, fissures, and lesions were "debrided," and were cleaned and dressed with a multilayer compression, and Plaintiff was instructed to keep the compressing dressing intact for a minimum of two days.  (UdF 40.)  During the February 24, 2016 visit, Siegrist further noted the findings from Plaintiff's lung biopsy taken on January 13, 2016, whereby Siegrist concluded that Plaintiff had chronic interstitial disease and further discussed with Plaintiff the pain he felt around his left elbow and steroid injection to address the pain.  (UdF 41.)  In light of Plaintiff's health condition during the February 24, 2016 visit, as well as the findings and recommendation made by dr. Zorrilla during the February 9, 2016 consultation, Siegrist determined that granting a temporary walker for sixty days was warranted, and further submitted requests for follow-up podiatry and pulmonology consultations.  (UdF 42.)

The undisputed evidence demonstrates that Siegrist did not ignore or fail to treat Plaintiff's wounds.  To the contrary, the evidence reflects that Siegrist listened to Plaintiff's requests for treatment and request for a walker, but he believed it was not medically necessary.  While Plaintiff may have wished to further discuss his foot conditions, Siegrist stressed the seriousness of his lung condition and resulting weight loss and attempted to re-focus Plaintiff on those issues.  Nonetheless, Defendant Siegrist referred him for additional pulmonary tests and pulmonology consultation.  (UDF 36.)  Although Plaintiff complained of foot pain, Siegrist's actions demonstrate that Plaintiff's health would be best served by prioritizing his lung condition and weight loss first and foremost, which were substantially more urgent than his foot condition.  As a layperson, Plaintiff's belief that his foot conditions were more urgent than his lung condition and weight loss is not admissible.  Fed. R. Evid. 701.  Therefore, Plaintiff's opinion that he had an urgent need for treatment and/or a walker prior to

February 2016, is not admissible.  Only an expert witness with specialized knowledge may determine whether Defendant's conduct was within the appropriate standard of care, whether Defendant's actions or failure to act were the cause of any harm, or if delays in Plaintiff's treatment led to further harm. For that reason, Defendant Siegrist's action in triaging the treatment for his various medical conditions is a class example of the exercise of medical judgment.  (UdF 12.)

In opposition, Plaintiff references appeal log number ASP HC 15029625 in which Plaintiff claimed that he was provided with inadequate health care, in particular that Siegrist was indifferent to and ignored issues pertaining to his shoulder pain, tendonitis, and "lesions" on his foot.  (ECF No. 54, Opp'n at 71-72; UdF 88.)  However, Plaintiff's handwritten complaints about the treatment or lack thereof provided by Defendant Siegrist in a CDCR 602 inmate grievance is insufficient to create a genuine dispute of material fact.  Accordingly, Defendant Siegrist is entitled to judgment as a matter of law.

        3.    <u>Defendant Registered Nurse Van Blargen</u>

Plaintiff contends that on December 14, 2015, he complained to Defendant Van Blargen about his pain and inability to walk due to his open wound.  (Sec. Am. Compl. at 8.)  While Van Blargen dressed the wound, Plaintiff contends this treatment was inadequate because the wound continued to grow.  (<u>Id</u>.)  On December 21, 2015, Plaintiff again complained to Van Blargen about his increasing pain and difficulty walking, particularly because the wound alleged had grown in size.  (<u>Id</u>. at 9.)  On December 23, 2015, Plaintiff again complained to Van Blargen, and complained to him for a third time on December 28, 2015.  (<u>Id</u>.)  Van Blargen dressed the wound again, but Plaintiff contends that did nothing to stop it from growing.  (<u>Id</u>.)  Then, on January 5, 2015, Plaintiff showed Van Blargen a second wound that had begun to develop on his left heel.  (<u>Id</u>.)  Plaintiff explained that standing on his feet, walking to the dining room, showering, and using the restroom caused intense pain.  (<u>Id</u>.)  Van Blargen applied the usual ointment and dressing remedies, which were ineffective.  (<u>Id</u>.)  Lastly, on February 5, 2016, Plaintiff complained to Van Blargen about his continuing pain.  (<u>Id</u>. at 10.)  Van Blargen noted his distress but continued with the usual treatment, which Plaintiff contends was ineffective.  (<u>Id</u>.)

///

25

Here, it is undisputed that on December 14, 2015, in his capacity as a registered nurse, Van Blargen saw Plaintiff for a medical visit, in which he complained about lesions on his foot that frustrated his ability to walk.  (UdF 43.)  During the December 14, 2015 visit, Van Blargen observed a cut (also known as a fissure) to Plaintiff's right heel, which was approximately two centimeters long.  (UdF 44.)  In evaluating the cut to Plaintiff's right heel during the December 14, 2015 visit, Van Blargen observed dry cracking on both feet, noticed foot fungus formation, but otherwise observed no active bleeding.  (UdF 45.)  Based on observations of Plaintiff's right heel on December 14, 2015, Van Blargen's medical opinion was that the cut appeared to be a chronic and, therefore, long-term condition.  (UdF 46.)  Acknowledging that the cut could cause pain, Van Blargen's medical opinion, based on his observation of Plaintiff's foot during the December 14, 2015 visit, was that the cut did not pose a substantial risk to Plaintiff's health.  (UdF 47.)  Based on his observation of Plaintiff's foot during the December 14, 2015 visit, Van Blargen determined that, under the circumstances, wound care via sterilization and dressing was reasonable and sufficient to mitigate further injury and infection risk, assuming Plaintiff followed the advice of medical staff.  (UdF 48.)

On December 21, 2015, Van Blargen saw Plaintiff for a medical visit, which was prompted by a health care request form submitted by Plaintiff in which he complained about a cut to his right heel area and request for a walker.  (UdF 49.)  During the December 21, 2015 visit Van Blargen observed that the cut was two-to-three centimeters, remained without signs and symptoms of an infection, and appeared to be improving.  (UdF 50.)  Van Blargen instructed Plaintiff to continue with daily dressing, and informed Plaintiff that he would discuss his request for a walker with his primary care physician, noting that a follow-up visit had been scheduled for the following week.  (UdF 51.)

On December 23, 2015, Van Blargen saw Plaintiff for a medical visit, which was prompted by a health care request form in which Plaintiff mainly complained about pain in both shoulders, albeit he also complained about pain his right heel.  (UdF 52.)  During the December 23, 2015 visit, Van Blargen measured Plaintiff's vital signs—such as his blood pressure, pulse rate, and temperature—and also observed his range of movement and bodily extremities.  (UdF 53.)  While the December 23, 2015 visit mostly focused on Plaintiff's shoulder pain, Van Blargen note that Plaintiff was referred to a podiatry specialist to assess his foot-related pain.  (UdF 54.)

On December 28, 2015, Van Blargen saw Plaintiff for a medical visit, which was prompted by Plaintiff's complaints pertaining to his foot fungus and sharp pain arising from the cut to his right heel area.  (UdF 55.)  During the December 28, 2015 visit, Van Blargen observed substantial callus formation on his right foot (i.e., thickening and hardening of the skin due to exposure to repeated friction), as well as foot fungus and a cut to his right heel.  (UdF 56.)  Based on observations of Plaintiff's physical condition and medical assessment during the December 28, 2015 visit, Van Blargen's medical opinion was that proper foot care and hygiene were key to effectively managing Plaintiff's cut to his heel, and, on this basis, Van Blargen cleaned, applied antibiotic ointment to, and re-dressed Plaintiff's right foot.  (UdF 57.)  Van Blargen advised Plaintiff to make sure to keep his feet clean, using soap and water, and to ensure his feet remained dry.  (UdF 58.)

On January 5, 2016, Van Blargen saw Plaintiff for a medical visit, which was prompted by Plaintiff's complaint pertaining to a cut to his left heel care.  (UdF 59.)  During the January 5, 2016 visit, Van Blargen observed that the cut was located within the middle left heal area—amid callous, dry, and cracking skin.  (UdF 60.)  The cut to Plaintiff's left heel developed approximately one week before the January 5, 2016 visit.  (UdF 61.)  Van Blargen observed that the cut to Plaintiff's left heel was approximately 1.5 centimeters in length.  (UdF 62.)  Van Blargen also observed that the cut to Plaintiff's right heel remained largely unchanged, albeit the right heel area became heavily callused but was without any active bleeding.  (UdF 63.)  Van Blargen irrigated and cleansed the cuts to both feet using sodium Chloride Irrigation solution and Chlorhexidine skin cleanser, both of which were standard sterilizing solutions.  (UdF 64.)  During this visit, Van Blargen learned that Plaintiff had a pending appointment with a podiatry specialist, who would address the cuts to his feet as well as the callus issues, and otherwise referred him for a follow-up appointment with the registered nursing clinic.  (UdF 65.)

On February 5, 2016, Van Blargen saw Plaintiff for a medical visit, the purpose of which was to follow up on the cuts to Plaintiff's heels.  (UdF 66.)  During the February 5, 2016 visit, Plaintiff reported no change in either foot, albeit Plaintiff reported that he still experienced pain and continued to have difficulty walking.  (UdF 67.)  Van Blargen observed that Plaintiff was ambulating with a

1    cane, and further observed that there was no sign of infection on Plaintiff's feet.  (UdF 68.)  Van

2    Blargen noted that a podiatry consultation had been scheduled for February 9, 2016.  (UdF 69.)

3    Van Blargen provided instruction to Plaintiff to maintain all his follow up appointments and to take all

4    prescribed medications in accordance with his primary care physician's order, to which Plaintiff

5    responded that he understood.  (UdF 70.)  While Van Bargen noted the pain reported by Plaintiff

6    during the February 5, 2016 visit, Van Blargen's medical opinion nonetheless was that no further

7    action was medically necessary, pending the consultation with the podiatric specialist.  (UdF 71.)  As a

8    registered nurse, Van Blargen did not have authority to, and accordingly did not, prescribe

9    medications, issue medical orders, approve or deny any request for a mobility device, or override the

10   orders or treatment plans of other medical providers such as a podiatry specialist, physician assistant,

11   or physician.  (UdF 72.)  During the relevant times, Plaintiff did not comply with medical staff's

12   advice and/or instructions with respect to proper foot care—including, but not limited to, walking on

13   prison grounds without any socks or shoes—which can exacerbate cuts to the heels.  (UdF 73.)

14        Based on the undisputed evidence, Plaintiff has failed to demonstrate that a genuine dispute of

15   material fact exists.  At the December 14, 2015 visit, Van Blargen observed the cut on Plaintiff's right

16   heel and did not deny that it caused pain.  (UdF 47.)  However, Van Blargen's medical opinion was,

17   based on his observation of Plaintiff's foot, that the cut did not pose a substantial risk to Plaintiff's

18   health.  (Id.)  Based on his opinion, Van Blargen determined that, under the circumstances, it was

19   reasonable and sufficient to care for the wound by sterilization and dressing to mitigate further injury

20   and infection risk, assuming Plaintiff followed the advice of medical staff.  (UdF 48.)

21        Plaintiff's claim that Van Blargen provided insufficient care despite informing him of his

22   grievance on December 21, 23, 28, 2015, lacks merit.  As set forth above, the undisputed evidence

23   demonstrates that beyond the wound care and education that Van Bargen provided to Plaintiff during

24   the December 21, 23, and 28 visits, no further action was medically necessary.  The evidence supports

25   the finding that Van Blargen duly noted Plaintiff's complaints and took reasonable steps to address

26   those complaints.  Plaintiff's mere disagreement with Van Blargen's medical opinions are insufficient

27   to give rise to a genuine dispute of material fact.

28   ///

28

As illustrated above, the main concern with respect to the wounds on Plaintiff's heels was to ensure that they did not develop into an infection.  With regard to the January 5, 2016 visit, the evidence confirms that Van Blargen took steps to mitigate the risk of infection by applying sterilizing solutions, while simultaneously noting that Plaintiff had a pending appointment with a podiatry specialist, who would further evaluate the wounds on his feet as well as the callus issues.  (UdF 65.)  In light of Van Blargen's evaluation concerning the condition of Plaintiff's cut, there is no evidence that the treatment was unreasonable under the circumstances.  While Plaintiff may disagree or preferred other treatment, his disagreement and personal opinion are insufficient to establish that the treatment at the January 5, 2016 visit constituted deliberate indifference in violation of the Eighth Amendment.  Accordingly, Defendant Van Blargen is entitled to judgment as a matter of law.

### 4.    Defendant Physician Assistant Hitchman

Plaintiff contends that on December 17, 2015, he asked Defendant Hitchman for wound treatment and a referral to a specialist.  (Sec. Am. Compl. at 8.)  However, after conducting an examination, Hitchman failed to treat Plaintiff's wound and failed to refer him to a specialist.  (Id.)

It is undisputed that on December 17, 2015, in his capacity as a physician assistant, Hitchman saw Plaintiff for a medical visit, which was prompted by Plaintiff's complaint pertaining to reported difficulties ambulating due to lower body pain.  (UdF 75.)   During the December 17, 2015 visit, Hitchman conducted a physical examination of Plaintiff, examining his chest and back area, which revealed no bruising or abrasions. (UdF 76.)  Plaintiff presented as having an unsteady gait and balance.  (UdF 77.)   From the physical examination on December 17, 2015, Hitchman observed that Plaintiff's gait appeared extremely deliberate and erratic, and objective findings from a strength examination revealed that Plaintiff could ambulate satisfactorily.  (UdF 78.)  Based on his observations, findings, and assessments during the December 17, 2015 visit, Hitchman had significant reservations about the way Plaintiff attempted to present himself during the visit, and concluded that inconsistencies between Plaintiff's attempted presentation and the objective findings from the physical examination reflected manipulative behavior on Plaintiff's part.  (UdF 79.)  Hitchman concluded that Plaintiff had minimal-to-no mobility impairment and, therefore, rescinded the wheelchair

1   accommodation.  (UdF 80.)  Hitchman advised Plaintiff to wear his orthotic shoes, and referred

2   Plaintiff to his primary care physician for further determination.  (UdF 81.)

3        Plaintiff declares that another inmate told him Defendant Hitchman claims to be a medical

4   doctor and he is "well-known for his 'animus' toward inmates with a reputation of being mean,

5   abusive, and uncaring."  (Opp'n at 67.)  Plaintiff became "very skeptical about letting Defendant

6   Hitchman examine [him]."  (Id.)  Defendant Hitchman isolated Plaintiff "to another area where his

7   female assistant was found seated behind a desk."  (Id. at 68.)  Hitchman then began to interview

8   Plaintiff and he asked Plaintiff a lot of questions about his boxing career.  (Id.)  Plaintiff further

9   declares that "Defendant Hitchman stood me up in front of him, grabbed onto my shirt with one hand,

10  pulling it tightly around my waist almost to the point of lifting my feet and frail body off the ground.

11  Defendant Hitchman then began spinning me from side to side so roughly that I lost my balance and

12  had to grab onto him.  When Defendant Hitchman released me, I was dizzy and confused and cannot

13  remember exactly what he said, but Defendant Hitchman made a comment about my being able to

14  pivot and him having a witness."  (Id.)  Plaintiff believes the examination was conducted without any

15  witnesses, besides his personal assistant in order to unjustly discredit him.  (Id.)

16       It remains undisputed that Defendant Hitchman is a licensed physician assistant who was

17  qualified to examine and treat Plaintiff on December 17, 2015.  (Hitchman Decl. ¶ 1 ("My duties and

18  regular functions as a physician assistant include reviewing inmate-patients' medical records for

19  assessment of their medical condition or diagnosis, meeting with and providing medical care to

20  inmate-patients, setting forth treatment plans, and referring inmate-patients for follow-up

21  appointments or visits as necessary."))  While Plaintiff may not have enjoyed or agreed with the

22  examination by Defendant Hitchman, there is insufficient evidence to demonstrate that Hitchman

23  acted with deliberate indifference on December 17, 2015.  To the contrary, Hitchman noted that he

24  observed callus formation on Plaintiff's right heel, but concluded that would not adversely impact

25  Plaintiff's ambulation activities.  Further, Hitchman advised Plaintiff to wear his orthopedic shoes and

26  referred Plaintiff to his primary care physician for further evaluation.  Plaintiff's disagreement with the

27  examination and treatment is insufficient to demonstrate deliberate indifference.  Accordingly, based

28

30

on the undisputed evidence, there is no genuine dispute of material fact as to whether Defendant

Hitchman acted with deliberate indifference.

> 5.      Defendant Registered Nurse Silveira

Plaintiff alleges that Defendant Silveira arrived to an ongoing visit he had with physician

assistant Siegrist on January 14, 2016.  (Sec. Am. Compl. at 10.)  Siegrist allegedly asked Silveira to

assist her examine Plaintiff's feet, but Silveira downplayed the seriousness of his wounds and

contradicted other medical providers.  (Sec. Am. Compl. at 10.)

It is undisputed that during the January 14, 2015 visit, Silveira only observed Plaintiff's foot

condition.  (UdF 84.)  Even assuming Silveira expressed his opinion that Plaintiff's foot conditions

were not serious, this does not demonstrate deliberate indifference.  Any opinion that Silveira

communicated to medical staff, including physician assistant Siegrist, pertaining to Plaintiff's foot

condition was informal, complimentary, and non-binding.  (UdF 85.)  Based on observations of

Plaintiff's foot condition, and in light of Plaintiff's medical complaints and/or presentation, Silveira

did not believe that Plaintiff had a foot condition that posed a substantial risk of serious harm.  (UdF

86.)  Any action taken or opinion expressed by Siegrist in connection with Plaintiff's foot condition

did not bind or control the medical opinions or treatments of other medical providers.  (UdF 87.)

Further, as a registered nurse, Silveira lacked authority to issue any orders or override the

determinations of other medical providers.  (UdF 82.)  Siegrist was not subordinate to Silveira.  (UdF

83.)  It is undisputed that the only action taken by Silveira was his opinion as to the condition of

Plaintiff's foot, which had no binding effect.  Consequently, even assuming the validity of Plaintiff's

testimony regarding Silveira's conduct on January 14, 2016, there is no evidence that Silveira ignored

a substantial risk of serious harm or influenced others to ignore any substantial risk of serious harm.

Plaintiff's claim is nothing more than a disagreement with Silveira's non-binding opinion which does

not give rise to deliberate indifference in violation of the Eighth Amendment.

> 6.      Defendant Dr. Conanan

Plaintiff contends that Dr. Conanan responded to his request for treatment by dismissing it as

"less urgent" than other issues, overruling the orders of other providers.  (Sec. Am. Compl. at 10.)

Plaintiff further alleges that, on February 1, 2016, Dr. Conanan denied his "emergency appeal" for a

mobility device as "not medically indicated."  (Id.)  Plaintiff argues this denial proved to be incorrect eight days later by independent specialist Dr. Orlando Zorrilla, who ordered a walker for Plaintiff. (Id.)

It is undisputed that On January 12, 2016, Dr. Conanan met with Plaintiff to interview him in connection with the review of a healthcare grievance, identified as grievance log number ASP HC 15029625, which grieved that Plaintiff was provided with inadequate health care, in particular that Siegrist was indifferent to and ignored issues pertaining to his shoulder pain, tendonitis, and "lesions" on his foot.  (UdF 88.)  During the January 12, 2016 interview, Plaintiff was allowed to fully explain his grievance issues.  (UdF 89.)  Based on Dr. Conanan's review of Plaintiff's grievance and pertinent medical records, Dr. Conanan concluded that Plaintiff's staff misconduct allegation was not substantiated.  (UdF 90.)  Dr. Conanan's conclusion from the January 12, 2016 interview was based on his assessment that, during his visit with physician assistant Siegrist, Plaintiff's lung condition and related symptoms took priority over less urgent conditions such as the cut to his foot, justifying Siegrist's focus on Plaintiff's lung issues.  (UdF 91.)  Dr. Conanan further concluded that, contrary to what Plaintiff claimed, his foot-related complaint was not ignored, but rather Plaintiff's foot-related grievance was appropriately noted, and the cut to his heel was appropriately treated with ointment and dressing.  (UdF 92.)    From the January 12, 2016 interview, Dr. Conanan further concluded that, given Plaintiff's musculoskeletal condition—i.e., condition pertaining to his muscle and skeletal systems— was stable and adequately addressed under the circumstances, no further intervention was medically necessary.  (UdF 93.)   On February 1, 2016, a first-level institutional response was issued concerning a healthcare grievance filed by Plaintiff, identified as grievance log number ASP HC 15029632, which grieved that physician assistant Hitchman examined Plaintiff to determine whether he needed a wheelchair given his "lesion" on his right heel but improperly focused on other issues and rescinded the wheelchair.  (UdF 94.)  Dr. Conanan reviewed Plaintiff's grievance log number ASP HC 15029632 and pertinent medical records, and found that nurse practitioner Mathos evaluated him and noted foot calluses but did not order a walker; Plaintiff's foot received wound care dressing; and Plaintiff was referred to a podiatry specialist and awaiting consultation.  (UdF 95.)  Based on his review of the medical records and findings, Dr. Conanan concurred with the determination that neither

a wheelchair not walker was medically indicated, and grievance log number ASP HC 15029632 was partially granted.  (UdF 96.)

Plaintiff declares that he was never once attended to by Dr. Conanan in a physician-patient capacity but only in his capacity as a reviewer of his health care appeal.  (Opp'n at 66.)  While that may be true, it does not demonstrate deliberate indifference on the part of Dr. Conanan.  Indeed, it is undisputed that Dr. Conanan's involvement in Plaintiff's treatment was limited to his review and assessment of whether the medical care previously provided was appropriate.   Based on the undisputed evidence, it is clear that Dr. Conanan listened to Plaintiff's subjective complaints, reviewed his grievances, and thoroughly reviewed his medical records, and concluded that the medical evaluations and treatment provided was appropriate.  Plaintiff has failed to present evidence to support a reasonable inference that Dr. Conanan's decisions were "medically unacceptable" or evinced a "conscious disregard of an excessive risk to [his] health," Jackson v. McIntosh, 90 F.3d at 332, and Dr. Conanan's agreement with the prior medical decisions and treatment fails to demonstrate deliberate indifference.   Even assuming, as Plaintiff alleges, that Dr. Conanan's examination was inadequate such would establish nothing more than potential negligence and/or medical malpractice which is not enough.  See Estelle, 429 U.S. at 105-106.  Plaintiff's disagreement with Dr. Conanan's assessments and conclusions fails to demonstrate deliberate indifference.  Accordingly, the undersigned recommends that summary judgment be granted in favor of Defendant Dr. Conanan.

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendants' motion for summary judgment be granted; and

2.      The Clerk of Court be directed to enter judgment in favor of Defendants.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **twenty-one (21) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

1

2   Findings and Recommendations."  The parties are advised that failure to file objections within the

3   specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-

    39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

4

5

6   IT IS SO ORDERED.

7   Dated:   **June 15, 2021**

8                                                           UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28